ANA MARÍA SUGAR COMPANY, PLAINTIFF AND APPELLANT, v. CASTRO ET AL., DEFENDANTS AND APPELLEES.

APPEAL from the District Court of Mayagüez in an Action for the Annulment of a Sale.

No. 1912.—Decided March 30, 1920.

TAX SALE.—CONSPIRACY—EVIDENCE.—When a creditor sues for the annulment of certain acts and contracts of the defendants on the ground that they are fraudulent and simulated, being the result of a conspiracy to defraud the plaintiff, the proof of such conspiracy must be clear, strong and convincing, particularly when the title sought to be annulled was acquired at a sale of the property for the payment of taxes and the plaintiff does not attack the validity of the sale, of which he had previous knowledge.

ID.—ID.—ID.—PRESUMPTION.—Where the plaintiff alleges a conspiracy to defraud, until such conspiracy is proved the defendants are subject to no more suspicion than would be any other defendants called as witnesses, and their testimony, although interested, must be presumed to be true until duly discredited.

ID.—ID.—CONSIDERATION.—A sale for taxes is not a transfer within the meaning of section 1264 of the Civil Code which forbids transfers in fraud of creditors. No conveyance is fraudulent if made for a valuable consideration.

Id.—Id.—FRAUD.—Fraud is never presumed and cannot be proved by conjectures, and defendants charged with fraud are entitled to the benefit of any reasonable theory consistent with honesty.

Id.—Id.—JUDGMENT ON PLEADINGS.—A motion for judgment on the pleadings should be made before the case is called for trial. In this case the answers of the defendants were not sufficiently non-responsive or evasive as to justify a judgment on the pleadings.

Id.—Id.—AMENDMENT.—A court always has discretion to permit an amendment to a pleading and on appeal the ruling granting an amendment will not be reversed unless the amendment has operated as a surprise to the adverse party.

Id.—Id.—COSTS.—In the absence of a showing of an abuse of discretion it cannot be held that the district court erred in awarding costs and attorney fees to the defendants in an action where the plaintiff alleged but did not prove fraud and conspiracy.

The facts are stated in the opinion.

*Messrs. Feliu & Alemañy* for the appellant.

*Messrs. F. Soto Gras, J. Sabater* and *R. Ramírez Vigo* for the appellees.

MR. JUSTICE WOLF delivered the opinion of the court.

The Ana María Sugar Company brought suit in the District Court of Mayagüez against certain defendants and, as judgment was pronounced in favor of the said defendants, the said Ana María Sugar Company appealed.

The object of the complaint, as expressed by the appellant in its brief, was to annul certain alleged contracts made by appellees among themselves and to annul certain acts done by them, in relation to the said contracts. Similarly, as indicated in the brief, the theory on which the complaint was brought, according to the appellant, was that the said contracts and acts were the result of a combination or a conspiracy concerted and carried into effect by the appellees with the sole purpose of defrauding the appellant.

As the result of a sale for taxes an alleged irredeemable tax title arose in one of the appellees, but while the appellant attempted to destroy the alleged tax title on grounds of fraud and conspiracy, it made no attack on the validity of the tax proceedings as such. In other words, the object

of the complaint was not to impugn the governmental proceedings whereby the sale was made and a title, not subject to redemption, arose in the purchaser, but solely on the ground of the combination, conspiracy and fraudulent acts of the appellees whereby such a tax title was caused, suffered or permitted to arise in one of the appellees to the injury of the appellant. The complaint is even more limited in its theory.

On November 9, 1915, appellee Miguel Castro Rivera, for himself and as attorney in fact for his wife, acknowledged in a public deed that he owed the sum of $5,222.21 to the Ana María Sugar Company, arising from the sales of sugar cane and other agricultural matters, and in said deed the said Castro bound himself to pay the said sum in various instalments, the whole debt to mature upon any default in payment; and to secure this debt the said Castro executed a mortgage on two pieces of property, one of them rural and the other urban, for the purpose and with the effect of making this obligation a first mortgage on the said property, and the obligation in fact became such a first mortgage duly recorded. Forty-five hundred dollars of the debt was secured by the urban property and seven hundred and twenty-two dollars by the rural piece.

On the 22nd day of November, 1915, a second mortgage on the rural property was executed by the same debtor to secure a note payable to the owner of the said note, which said note came into the hands of Francisco del Moral, one of the appellees, so that a second mortgage arose in the hands of said del Moral.

The *bona fides* of this alleged note was attacked, as were other indebtedness of Castro to del Moral, but while some doubt has been thrown on the amount of this indebtedness by the inconsistencies in the statements of del Moral and Castro, until the conspiracy is proved independently, none of the statements of Castro, the debtor, would be binding on his creditor, del Moral. There is some divergence among

the appellees as to the total amount of this indebtedness, but we cannot, on this appeal, question the fact that approximately the indebtedness claimed by del Moral existed. Likewise, until the conspiracy is proved, del Moral and Castro are subject to no more suspicion than would be any other defendants called as witnesses. Our own examination of the proof does not convince us that their statements as to the amounts of the indebtedness were false and such statements must have the benefit of the presumption of honesty that runs in favor of all witnesses until duly impeached or discredited inherently and this presumption is aided by the general finding of the court. We shall have occasion to amplify this discussion a little later in our opinion.

The destruction of the truth of these statements would solely tend to show a feigned mortgage and a feigned indebtedness between del Moral and Castro and to destroy their testimony. We think it will be shown that the utter destruction of their testimony and a proof of an indebtedness entirely feigned will not be sufficient to establish the particular conspiracy on which the appellant must rely to make out a case. It is unnecessary to lay much stress on this feature, however, as we do not find that either the mortgage or the other indebtedness was feigned.

On June 28, 1916, for a default in the payment of taxes the two properties were sold to del Moral, the rural for $55.04 and the urban for $21.25. At the date of the sale the two properties were probably worth more than the amount of the first mortgage, if not several thousands more.

On August 1, 1916, Castro and the complainant made another contract with regard to the rural property, wherein the appellant agreed to redeem the said property. At the trial Castro testified that Alfonso Valdés, the president of the appellant corporation, agreed at the same time to redeem the city property, and the truth of this statement is not denied by Valdés, although the appellant questioned the truth of it on account of the supposed inherent contradictions

in the testimony of Castro himself. The said Alfonso Valdés testified that he had a conversation with del Moral about this time or a little later wherein del Moral stated that he would reconvey the rural property to Castro when he saw him. Del Moral absolutely denies having made such a statement.

The time for redemption expiring in June, 1917, appellee del Moral, on June 26 of that year, had both pieces of property definitely recorded in his name, and, on November 26, 1917, transferred the rural property to Justo Vélez, another of the appellees. After stating most of the foregoing facts in a somewhat different form, the appellant alleges that all these acts of the appellees were done secretly by them, availing themselves of the confidence that the appellant had at that time in Castro and del Moral.

It seems very hard indeed that property valued at many thousands of dollars should pass from one hand to another for the paltry sum of $76.29 and courts generally are loath to sustain such sales and set them aside even where slight errors appear in the proceedings, but, with the record before us, we are convinced that, as the tax titles in themselves are not attacked, we would not be justified in going counter to the general finding of the court that the facts were against the complainant.

The appellees, and especially Castro and del Moral, were intimate friends. Of this there is no doubt, but neither friendship nor relationship is sufficient by itself to prove fraud or conspiracy. Appellant lays some stress on the fact that Castro, a republican, would help del Moral, a unionist, in his political campaign against Valdés, republican, but appellee del Moral very well points out that the alleged canvass and election took place later. We fail to see the importance of this instance as tending to show anything more than the fact, as stated by appellee del Moral, that Castro and himself were old, intimate friends.

The appellant showed that Castro was hopelessly insolvent and one of the theories of the appellant, but not of the complaint, is that the acts or omissions of appellees whereby a tax title arose in del Moral were equivalent to transfers made in fraud of creditors as forbidden by section 1264 of the Civil Code. This section refers specifically to transfers and has absolutely no application to titles arising by tax sales. Furthermore, the words in said section which say that a conveyance is presumed fraudulent when made by a person against whom the condemnatory judgment has been pronounced (of which there was a number against Castro) must be taken in the sense in which they are used. No conveyance is fraudulent if made for a valuable consideration. It is only that the conveyance itself is presumed fraudulent until the grantee shows that such conveyance was in fact made for a valuable consideration, as would be the case here if this were a deed from Castro to del Moral.

If the result of this alleged conspiracy was merely to give del Moral a preference, such preference is only forbidden under certain conditions by the National Bankruptcy Law, necessarily not involved in this case. *Coder* v. *Arts,* 213 U. S. 242.

Sufficient space is given in the brief to the question of insolvency and the judgments against and debts of Castro. This state of facts seems to hurt rather than help the theory of the complaint because, as Castro was hopelessly insolvent, the disposition of his property would probably be a matter indifferent to him, especially if he were going to lose the possession. But, as we have intimated, this is not the theory of the complaint. The insolvency judgments, debts of Castro, etc., are not set forth as facts and are not charged.

Del Moral admits and even asserts that having obtained these properties at the tax sale, he is disposed to charge off Castro's indebtedness to him, or at least so much thereof as was owing to him at the time. He himself has lent color to

the theory that he was trying thus indirectly to obtain a preference for his debts.

All of these considerations of insolvency and the like would tend to obscure the main issue in the case, namely, the alleged existence of a conspiracy among the appellees. If del Moral acquired these properties by reason of a secret combination between himself and Castro for the purpose of defrauding the Ana María Sugar Company, then the insolvency of Castro makes very little difference. In other words, to prove its case the appellant must rely on some combination or understanding between del Moral and Castro, fraudulent in law as against the Ana María Sugar Company. This is necessarily the principal contention of the appellant and upon the existence of such conspiracy the case must stand or fall.

We deem it well at this point to review the law with respect to the persons who may buy at tax sales and obtain a clear title. The law in the United States is well settled that the owner of property may not buy at a tax sale and obtain a clear title. He may not buy at a tax sale and thus defeat the lien of his mortgagee. *Gates* v. *Lindley,* 38 Pac. 311; Black on Tax Titles, 273 *et seq.;* Cooley on Taxation, 3d Ed., p. 965; 37 Cyc. 1345-47; *Moss* v. *Shear,* 25 Cal. 45, 55 A. D. 94, and its citations. The reason at the bottom of this rule is that the mortgagor is already under a duty to pay the taxes and that hence the courts will construe a purchase by him as the equivalent of a payment of the taxes.

Similarly, what an owner or mortgagor cannot do for himself directly he cannot do indirectly or by an agent or *persona interposita,* and where property is bought under such circumstances that a court of justice may conclude that it was really a purchase for the owner, such sale will be set aside in the interests of the mortgagee. *Gates* v. *Lindley, supra; Beltram* v. *Villere,* 4 Southern Rep. 506; *Austin* v. *Citizens' Bank,* 30 La. Ann. 689; *Drake* v. *Sherburne,* 22 S. W. 430, and other cases cited in the notes to *Cones* v.

*Gibson,* 16 L. R. A. (N. S.) 121, and *Zuege* v. *Nebraska Mortgage Company,* 52 L. R. A. (N. S.) 877.

The principle at the bottom of these later citations also necessarily is that neither the owner nor a *persona interposita* may acquire land at a tax sale because he is already under a duty to pay the taxes and the purchase operates as payment. Incidentally, it may be noticed that the complainant does not state that del Moral bought and now holds for Castro, but the theory of the complaint in paragraphs VIII, IX and X is that del Moral bought with Castro's money. This was also the trial theory, the complainant's efforts being principally to show that all the debts of Castro to del Moral were feigned. Del Moral stoutly maintained that he bought with his own money.

We may assume that the principles of the foregoing cases are applicable in Porto Rico, although the system of the Political Code and the Mortgage Law with their cancellation of recorded mortgages when a tax sale is made throws some doubt on the question. We shall also assume, if not hold, that if the proof had shown that Castro, operating with del Moral, failed to pay his taxes and thereby allowed an irredeemable tax sale title to arise in del Moral, always supposing a secret understanding between the two to effect the object of the combination, then the tax title of del Moral was null and void and subject to be annulled at the suit of the Ana María Sugar Company.

Now, while it is of course physically possible that there was such a combination or conspiracy between Castro and del Moral, we find in the record no satisfactory evidence to prove it. To the suggestion that Castro would hardly allow a property worth so many thousands of dollars to be sold for less than a hundred, we may repeat that the very insolvency of Castro would probably make him indifferent as to what became of these mortgage liens. He was hopelessly in debt. There were all kinds of suits pending against him.

He probably did not have $79.26 in his possession at any time which he did not want for some more imperious necessity. He knew of the tax sale and that del Moral had bought at such sale and he may have been perfectly indifferent as to whether a tax title arose in del Moral or, indeed, as appellant urges, he might have been very anxious that del Moral rather than the Ana María Sugar Company should get the property, especially as del Moral was his friend. The record shows that he expressed a violent dislike to Valdés and to the Ana María Sugar Company, but neither this implacable hatred nor this indifference is a badge of fraud. It is true that when del Moral wanted him to turn over the property Castro made a protest that the property was worth a great deal more than the amount that he owed del Moral, but this protest is perfectly consistent with a desire to obtain something else for himself from del Moral, whatever it was, especially as there were possible crops on the rural property. However, he did, in point of fact, turn over the property to del Moral.

The appellant says that Castro and del Moral concealed the second mortgage on the rural property and only recorded it after the time for redemption had passed. It seems to us that it makes very little difference as to whether this debt was secured or unsecured, recorded or unrecorded. The only matter that could play any part at all was whether Castro was indebted to del Moral in the sum of $1,000. Of course there was no doubt that the complainant had a preferential mortgage.

These considerations dispose of the first five points of the appellant in its brief in discussion of the ninth error.

The sixth point is the most important and in the discussion of it we shall, more or less directly, discuss the other fifteen points with the exception of the matter that refers exclusively to appellee Vélez. The sixth point specifically is the attitude and conduct of del Moral and Castro towards the complainant.

A conspiracy between del Moral and Castro being charged, it is important to try to fix the possible beginning of this conspiracy. There is no direct evidence of any such conspiracy, but, as is usual with cases of conspiracy, the proofs frequently come indirectly or by way of circumstantial evidence. When did this conspiracy between Castro and del Moral begin? It seems impossible, knowing the almost invariable attitude of a man who is hopelessly insolvent, that Castro deliberately did not pay his taxes merely with the idea of favoring del Moral and injuring the Ana María Sugar Company. As is usual with insolvent debtors, he probably did not pay the taxes when due because it was inconvenient. This is the common-sense inference and the presumption from honesty.

Under section 315 of the Political Code, when property is attached for taxes, the Treasurer of Porto Rico is bound to notify all persons having a mortgage or other lien on said property of record of such sale and in said notice to state the date of the sale and the amount for which the property was sold and such other facts as he may deem advisable. The Ana María Sugar Company presumably had such a notice and Valdés says that he mentioned this fact in his conversation with del Moral. Everybody was advised of the whole situation.

The proof tends strongly to show, as conceded by appellant, that it was Castro who insisted that the Ana María Sugar Company should redeem the outstanding tax title on the rural property, and such agreement was put into the contract by Castro and the Ana María Sugar Company when they were making a new arrangement with respect to the said property. To say that Castro and del Moral were conspiring at that date is to credit Castro with an amount of diabolical cunning and subtlety rarely found in a human being. One would have to assume that he persuaded the Ana María Sugar Company to make this contract for re-

demption of the taxes in the hope that they would be lulled into security as to both properties by their own agreement— a perfectly absurd assumption. It is equally absurd, given the law as to the notification to mortgagees and the actual knowledge of the tax sale by Valdés, to suppose that Castro, inimical as he was to the Ana María Sugar Company, was urging them to redeem the property when at the same time a conspiracy between himself and del Moral existed. We may put aside, we think, any thought that a conspiracy between del Moral and Castro to defraud the Ana María Sugar Company existed at the date of the signing of the contract between Castro and the Ana María Sugar Company. The whole record convinces us that no conspiracy existed or could exist before the tax sales were made. When, then, did the conspiracy arise?

Del Moral already had bought the property and, short of a conspiracy, would acquire it free from the claims of all the world, provided that there was no invalidity in the tax sale, and he had no such relations with the property that would make it incumbent upon him to pay the taxes himself. So that the form that the conspiracy would have to take at this date would be one whereby del Moral fraudulently entered into a combination wherein Castro was not to redeem the rural property. There was an existing contract on the part of the Ana María Sugar Company to redeem it itself and charge to Castro. We find absolutely no proof that there was any such specific agreement between Castro and del Moral. The appellant does not ask us to make the bald inference, namely, an agreement not to redeem, but it asks us to suppose a general state of fraud and conspiracy from subsequent acts and conduct and supposed admissions of del Moral and Castro. But we hold that it was necessary for the appellant to prove, from sufficient circumstances, the other averments of the complaint failing a conspiracy on the part of del Moral and Castro to keep the latter from redeeming the property.

The appellant lays great stress on the difference between the rural property and the urban property, inasmuch as there was no specific agreement on the part of the Ana María Sugar Company to redeem the city property; but, whether there was such agreement or not to redeem the city property, the Ana María Sugar Company was advised of the outstanding tax title and that it must be redeemed to prevent a title arising in del Moral, and so, with respect to either property, a conspiracy to induce Castro not to redeem should be proved, an almost impossible task. An explanation of the reason why Castro did not insist upon having a specific agreement about the redemption of the city property was that at the time he was treating with the Ana María Sugar Company the contract to be signed related only to the rural property. Given the fact that the Ana María Sugar Company knew of the sale for taxes; given the fact that Castro says so, we are disposed to believe the statement of the latter that he also requested Valdés to redeem the city property.

If this were an accident case we should be inclined to say that the proximate cause of the accident was the neglect of the Ana María Sugar Company to redeem the property and not the conduct of either del Moral or Castro. In any event, it is difficult to conceive of a conspiracy existing between del Moral and Castro when the Ana María Sugar Company was already under a contract to pay the taxes of the rural property and had, as the proof tends to show, also agreed to redeem the city property.

Some point is made by the appellant that del Moral agreed to reconvey to Castro. Independently of the fact that this is denied by del Moral, while his conduct might then be characterized as unethical or treacherous or what not, his failure to perform his alleged promise to Valdés does not tend to show a conspiracy between himself and Castro. He would, perhaps, improperly be favoring himself. To sup-

pose again that del Moral intentionally lulled the Ana María Sugar Company into a state of repose by his statement to Valdés is, as in the case of Castro, once more to suppose an incredible amount of astuteness on the part of del Moral.

The principles of the cases as to owners, or a *persona interposita,* buying, can have no application to a period after the sale and before redemption. The taxes are paid. No one is under a duty to pay them. Redemption is a privilege or a right existing in a person interested in the property.

We may, from the record, conceive the facts in this case to have happened somewhat as follows: Castro failed to pay his taxes. Del Moral bought the properties in at a tax sale. While it was not his custom to buy tax titles he testified that he sometimes did so to protect himself. Things went along until the time for redemption had passed, when he took advantage of the situation to record the property in his own name, free from the mortgages. Castro, if anything, was lulled into a sense of security by his agreement with the Ana María Sugar Company. Del Moral having the title to both properties and his original purpose being solely to protect his debts or perhaps his alleged mortgage debt, did not feel sure of his tax title, so generally uncertain, but did not want to hold the property as against Castro and allow the debts of Castro to continue as well. Therefore, after the tax title had matured and the mortgages were cancelled, he had an understanding with Castro whereby, for the surrender of the possession of the properties, he would, following his own original intention, credit Castro with the amount of his outstanding debts. It is perhaps for this reason that del Moral said, when examined on the stand, that Castro owed him and did not owe him, meaning thereby that he had perhaps other existing debts or perhaps that he had a continuing legal claim against Castro if his tax title should be unavailing.

In any event we do not need to dip into all the possi-

bilities that would be in favor of the honesty of both Castro and del Moral. Fraud is never presumed and defendants charged with fraud are entitled to the benefit of any reasonable theory consistent with honesty. The purposes and acts of del Moral and Castro may have been entirely different from those we have outlined, but the presumption is in favor of honesty until the contrary is clearly proved.

We have particularly examined the statement of del Moral. It is exceedingly frank and has all the ear-marks of honesty. He admits having credited Castro with his debts existing prior to the tax sale and having charged him the amount of the tax sales. He admits his friendship unqualifiedly. His very inconsistencies are *indicia* as common perhaps to an honest witness as to one who is aiding in a frame-up. His principal examination was when called as a witness for the complainant. If attention be drawn to the fact that he did not deny the conspiracy, it may be answered that he was under no duty to deny such conspiracy on the stand for four important reasons: First, because no duty devolves on a party to deny statements which the complainant is bound to prove, or, at least, until a *prima facie* case is made against him. Section 162 of the Law of Evidence provides among other things that "in civil cases the affirmative of the issue must be proved, and when the evidence is contradictory, the decision must be made according to the preponderance of proof." Second, because he was not asked such a question by the party that called him and that had a right to ask him the question without being bound by his answer. Third, because he had sworn to the answer and under very special circumstances. While the complainant, with the tolerance of the defendants, was cross-examining rather than examining him, it developed that the answer did not appear to be sworn, whether by neglect of the secretary or what not does not appear. Thereupon, after a discussion the court gave him permission to swear to the answer

at the trial.  The court, however, instructed del Moral to read the answer before swearing to it.  So that the swearing was done in open court and had, if anything, so far as its binding effect is concerned, an added solemnity.  If the facts were false, he was just as liable to a prosecution for perjury as if he had voluntarily testified to the nonexistence of the conspiracy so strongly denied in the answer.  Here the defendant took the stand several times and denied all the essential facts from which the conspiracy might be inferred.  Fourth, because it would be like denying a conclusion from the facts to make any further denial.

Both del Moral and Castro strongly deny the facts as set up in the complaint, namely, that del Moral bought with the money of Castro, or that there was an understanding between them.  Castro says that del Moral bought the property for taxes without telling him.  If it were true, as the court had a right to believe from the whole evidence, that there was no agreement or understanding between del Moral and Castro previous to the initial purchase of the tax title, then, as this is the real foundation point of the alleged conspiracy, the whole structure must fall.  *Debile fundamentum fallit opus.*

Let us take another point much insisted on by appellant.  Fructuoso Ojíos was called as a witness for the complainant.  The witness was asked whether he had any conversation with del Moral in regard to the properties acquired by del Moral in which Valdés was interested, and he answered ''Yes.''  He stated that as a political chief he was concerned with the accession of Castro to the party and that he expressed his doubts to del Moral of the certainty of the allegiance of Castro by reason of his obligation to pay Valdés.  Thereupon del Moral said: ''Don't worry, I have an understanding with him.''  What the understanding was does not appear.  It might have been a hold that del Moral had on Castro for a hundred different reasons.  A knowledge of a

crime, the enmity to Valdés, a promise to loan more money, or even the acknowledged old friendship, would be enough to explain this understanding. The mere matter of an old friendship is enough for one to know how far the friend may be trusted. But this conversation took place after the tax title was perfected. An understanding at that date proves nothing at all. No wonder that del Moral felt under no obligation to deny the conversation if false or that the court failed to give it due weight as insisted on by the complainant.

There is a conflict in the authorities as to how much proof is necessary to establish fraud, but we think that all the cases are agreed as to the necessity of proving fraud at least "clearly." This court, however, has always insisted that fraud must be clearly proved. *Calzada* v. *Carrero*, 15 P. R. R. 340; *Igaravídez* v. *Rubert Brothers*, 23 P. R. R. 272. And we at one time cited to the same effect the case of *Lalone* v. *United States*, 164 U. S. 255, likewise cited in the notes to 12 R. C. L. 436-49.

Now, whether fraud must be established by a preponderance of the proof or by strong proof or by proof beyond a doubt, the fact remains, as established by the courts, that fraud can never be a matter of mere conjecture. 10 R. C. L. 323. We feel that we would have to roam widely into this realm of conjecture to be convinced that the conspiracy existed.

We have been treating this case at times somewhat on the theory that perhaps not much credit should be given to the statements of del Moral and Castro. Del Moral and Castro were called as witnesses for the complainant. Now, whether any force is to be lent to the fact that they were called by the complainant or not, both of these witnesses are entitled to the benefit of section 21 of the Law of Evidence, namely, that a witness is presumed to speak the truth.

Other principles of the Law of Evidence are applicable in favor of the honesty of witnesses. *Vide* section 102, subdivisions 1 and 19 (Compilation of 1911, p. 289), as follows:

1. That a person is innocent of crime or wrong;

19. That private transactions have been fair and regular.

We have applied these principles in the following cases: *González* v. *Santini,* 26 P. R. R. 490; *Díaz* v. *Torres,* 17 P. R. R. 483; *Zalduondo* v. *Sánchez,* 15 P. R. R. 218; *Luard* v. *Unknown Heirs of Andreas Antelo,* 14 P. R. R. 180, a case in which we reversed the judgment of the court below, applying these principles.

Even though interested, the statements of parties are entitled to credit until there is some legal reason to suspect such statements. Del Moral and Castro gave important evidence tending to combat the theory of the complaint. Their testimony necessarily tends to overcome the case of the appellant and their testimony is entitled to due weight by us, without any consideration of the attitude of the court below, supposing, which it is not, that this was a case before us on first instance.

The court below, however, heard all the proof, and it would know better than we the credit to be given to any and all witnesses, and, after a general finding by the court below, the presumption of section 21 that witnesses speak the truth is reinforced and we should need a very strong case to doubt the statement of any witness, even though interested.

We may even doubt whether there has been any substantial conflict in the evidence. The appellant apparently would like us to believe the theory of his case because of the alleged improbability of the truth of the statements of del Moral and Castro and because of some inherent contradictions. The attitude of appellate courts towards the general finding of the court below, or where the evidence is conflicting, has

been summed up by us rather often, but it will do no harm to make a new citation from 4 Corpus Juris, 887:

"Sec. 2857.—*Findings against weight of evidence.*—As is the case with the verdict of a jury, a reviewing court will not interfere with the findings of a trial court merely because they appear to be against the weight or preponderance of the evidence. As otherwise expressed a finding, although it appears to be against the preponderance of the evidence, will not be disturbed if supported by substantial evidence, or by evidence legally sufficient to sustain it, or unless the findings are clearly and palpably against the great weight of the evidence, unless the evidence clearly requires a determination to the contrary, unless the finding is so manifestly against the weight of the evidence that the trial judge would set aside a similar verdict rendered on the same testimony, or unless the finding is so clearly against the weight of the evidence as to indicate mistake, prejudice, or improper influence. Nevertheless a finding will be set aside when it is clearly and palpably against the great weight of the evidence, or when the evidence is such that if the case had been tried by a jury, it would have been the duty of the court to direct a verdict for the opposite party."

"*Reason for rule.*—It is recognized that there are many things which cannot be spread upon the printed record, but may properly be considered by a trial court and are of great, and often controlling, significance in determining the truth as between conflicts from the mouths of witnesses. As experience shows, and from the very nature of things, justice is much more likely to be done by leaning pretty strongly upon the initial determination than by endeavoring to treat a disputed matter from an original standpoint. Hence the rule that there must not only be a preponderance of evidence against such determination, but there must be a clear preponderance. The significance of the word 'clear' is not always fully appreciated. Manifestly, that requires the preponderance to be so apparent as to manifestly outweigh any probable legitimate influence upon the triers of those advantages for discovering the truth which the reviewing tribunal cannot have. That is indicated by many expressions found in our decisions." *Ott* v. *Boring,* 139 Wis. 403, 406, 121 N. W. 126.

We shall spend no great time in considering the alleged second cause of action of complainant which concerns the transfer made by del Moral to Vélez. Vélez would be presumed

to be a third person until it clearly appeared that the state of the registry or that the acts of del Moral and Castro, supposing a fraud, were brought home to him. We think it was not established that Vélez knew of all the alleged fraudulent acts of del Moral and Castro, supposing a conspiracy between them. However, as the principal basis of this affirmance of the court's judgment is the lack of proof of the principal conspiracy, Vélez is of course entitled to the benefit of the considerations by which both courts arrived at such a conclusion.

The foregoing disposes of the principal error alleged by the appellant. The appellant also maintains that the court should have rendered judgment on the pleadings. In the first place we are of the opinion that a motion for judgment on the pleadings should be made before the case is called for trial for similar principles that are contained in *People v. París*, 25 P. R. R. 104. It is to be presumed that if the complainant goes to trial without raising a question of the sufficiency of the answer, either by such a motion or by a motion to strike, he is satisfied with the issues raised. In the interests of justice such a motion should not come as a surprise at the trial. We do not find that the answer of either del Moral or Castro or Vélez was sufficiently non-responsive or evasive to justify a judgment on the pleadings. These alleged defects should be reached by motion for further specification, or something equivalent. In any event we find that the appellant was not prejudiced by the action of the court. A judgment on the pleadings is in general more applicable when it becomes apparent that the defendant has mistaken his defense.

The second and seventh errors may be disposed of together. They are somewhat of the same nature as the matters treated in the first error assigned. The answer of neither del Moral nor Castro should have been stricken except for the lack of an oath, and this defect is only applicable to

the answer of del Moral and was cured by the action of the court in permitting him to make an answer. As we saw in discussing the first error, any other matters relating to deficiencies in the answer should be reached by motion made before trial. Hence, evidence of the defendants was admissible under the issue.

The third error is disposed of by saying that the court always has a discretion to permit an amendment to a pleading or even to a judgment. A court of appeal, in general, would only reverse for some deprivation or surprise to a complainant. A defendant is presumably never willingly in court and the courts are, if anything, more liberal in favor of giving him a chance to defend. We do not think the court committed error in not permitting the appellant to show that the original demurrer filed by Castro was signed by the same lawyer who ultimately appeared for Justo Vélez. It would not have tended to show fraud or conspiracy if all three defendants had appeared by the same attorney. We discussed a similar question in the case of *Ayllón* v. *González et al., ante,* p. 61. There was surely no prejudice.

The fifth, sixth and eighth assignments were either unimportant or harmless.

In the assignment of the ninth error, which is the principal one discussed by us, the appellant also alleges that the court was in error in rendering judgment for costs, disbursements and fees, but we do not find that the court committed an abuse of discretion in awarding the costs and fees. Where, under the law, a man has a right to acquire tax titles, as in Porto Rico, a complainant who charges fraud and conspiracy runs a risk of being mulcted in costs, if he fails to prove these facts, and we would be unable to say that the court committed an abuse of discretion in the award of fees.

The appellant made an elaborate analysis of the proof which appellee del Moral did not meet with a counter analysis, so that the able insistence of the appellant has thrown

this work of counter analysis on this court. It happens all too frequently that appellees, relying on the court below and the supposed correctness of its decision, throw too heavy a burden on the judges of this court.

The judgment must be

*Affirmed.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.

Mr. Justice Hutchison concurred in the judgment.